No. 25-2565

————

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

WISCONSINITES FOR ALTERNATIVES TO
SMOKING AND TOBACCO, INC., et al.,

     Plaintiffs-Appellants,

  v.

DAVID CASEY, Secretary of the Wisconsin
Department of Revenue,

     Defendant-Appellee.

APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN, THE HONORABLE
WILLIAM M. CONLEY, PRESIDING

**BRIEF OF APPELLEE,
WISCONSIN DEPARTMENT OF REVENUE SECRETARY CASEY**

JOSHUA L. KAUL
Attorney General of Wisconsin

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

LYNN K. LODAHL
Assistant Attorney General
State Bar #1087992

Attorneys for Defendant-Appellee

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 Gibson
(608) 264-6219 Lodahl
(608) 294-2907 (Fax)
charlie.gibson@wisdoj.gov
lynn.lodahl@wisdoj.gov

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...................................................................1

ISSUES PRESENTED ....................................................................................1

INTRODUCTION ..........................................................................................2

STATEMENT OF THE CASE ........................................................................3

I.   Factual background. ....................................................................3

A.   The federal Tobacco Control Act regulates tobacco products while expressly preserving States' authority to regulate the sale of such products. ..................3

B.   The FDA enforces the law against sellers and distributors of unauthorized e-cigarette products, especially flavored products, which are most appealing to youth. ...............................................5

1.   The FDA initially imposes a deferred enforcement period to allow e-cigarette manufacturers time to apply for and receive marketing authorizations; this period expires in September 2021. .......................................5

2.   In 2020, the FDA recognizes the public health crisis of youth e-cigarette use driven by flavored products and announces it will prioritize its enforcement efforts on those products. ...................................................7

3.   In 2021, the FDA issues a mass denial of over a million premarket applications for flavored e-cigarette products based on its assessment of the risks to youth. ................................... 10

4.   The FDA's current guidance makes clear that the FDA is actively enforcing the law against unauthorized products.............................. 11

C.   Appellant businesses specialize in the sale of unauthorized, flavored nicotine vape products. ................. 14

D. Wisconsin exercises oversight over the retail sale of smoking products in Wisconsin and, on December 6, 2023, enacts the vape directory law...................................... 17

E. Wisconsin spends 19 months preparing to implement the directory law and educating the public; the regulated industry also prepares. .................... 19

F. Appellant businesses choose to continue to stock unauthorized products........................................................ 20

II. Procedural history. ......................................................... 21

SUMMARY OF THE ARGUMENT ...................................................... 23

STANDARD OF REVIEW...................................................................... 24

ARGUMENT ............................................................................................ 25

The district court properly exercised its discretion in denying Appellants' motion for a preliminary injunction.................................. 25

I. Appellants make no strong showing that they are likely to prevail on the merits................................................................... 26

A. Appellants lack Article III standing. .................................. 26

1. A plaintiff lacks standing to bring suit to facilitate participating in an activity that, regardless of the suit's outcome, is illegal. ............... 26

2. This case is not like those relied on by Appellants, where a victory would make their conduct legal........................................................... 28

3. No evidence supports a conclusion that FDA has decided to treat any of the vape products Appellants sell as legal. ............................................ 29

4. Federal courts have limited jurisdiction under Article III, and not every claim is within the federal courts' power to decide. ................................ 31

iv

B. Appellants have made no strong showing that their preemption claim will prevail. ............................................. 32

    1. Preemption depends on congressional intent, and Appellants' theories ignore the presumption against preemption here. .................... 32

    2. 21 U.S.C § 337(a) does not impliedly preempt Wisconsin's statute. ..................................................... 34

        a. In the context of the Tobacco Control Act, the Preservation and Savings Clauses command that state sales restrictions like Wisconsin's are not preempted....................................................... 34

        b. Appellants' reading of 21 U.S.C. § 337(a) conflicts with the statute's language and *Buckman*. .................................. 37

    3. Appellants' "enforcement discretion" preemption theory is legally and factually unsupported. ............................................................ 43

    4. Appellants' claims that § 387p expressly preempts Wisconsin's law—not pled in the Complaint—are unpersuasive................................. 44

II. The balance of equities and the public interest weigh against a preliminary injunction. ............................................... 47

A. Appellants are not entitled to an equitable remedy when their lost income is from illegal sales and they made no effort to pivot to legal products in the lead-up period before the directory law went into effect. .......... 48

    1. Appellants have no valid reliance interest in revenue from illegal sales.......................................... 49

    2. Appellants did not try to avoid the economic harms they allege, instead continuing to sell and restock unauthorized products. ......................... 50

| | | |
|---|---|---|
| B. | The State and the public would be irreparably harmed by a preliminary injunction. | 52 |
| C. | The district court properly considered Appellants' unreasonable delay in seeking relief in weighing the preliminary injunction factors. | 54 |
| D. | A preliminary injunction is also unwarranted under the unclean hands doctrine. | 55 |

CONCLUSION ........................................................................................... 56

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018) .................................................................. 53

*ACLU v. Alvarez*,
679 F.3d 583 (7th Cir. 2010) .................................................. 48

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) .................................................................. 33

*Am. Acad. of Pediatrics v. FDA*,
399 F. Supp. 3d 479 (D. Md. 2019) ..................................... 6, 7, 14

*Anthony v. Country Life Mfg., LLC*,
2002 U.S. Dist. LEXIS 19445 (N.D. Ill. 2002) ............................ 40

*Arizona v. United States*,
567 U.S. 387 (2012) ............................................................. 13, 38

*Aurora Loan Servs., Inc. v. Craddieth*,
442 F.3d 1018 (7th Cir. 2006) .................................................. 26

*Bank One, N.A. v. Gattau*,
190 F.3d 844 (8th Cir. 1999) .................................................... 48

*Bell v. Am. Traffic Solutions, Inc.*,
371 F. App'x 488 (5th Cir. 2010) .............................................. 27

*Benisek v. Lamone*,
585 U.S. 155 (2018) ............................................................. 54, 55

*Brown v. Gilmore*,
533 U.S. 1301 (2001) ............................................................... 24

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ....................................................... 37, 38, 40

*California v. Zook*,
336 U.S. 725 (1949) ................................................................. 43

*Cassell v. Snyders,*
990 F.3d 539 (7th Cir. 2020) ...................................................... 25, 48

*Chamber of Com. of U.S. v. Edmondson,*
594 F.3d 742 (10th Cir. 2010) ......................................................... 33

*Chamber of Commerce v. Whiting,*
563 U.S. 582 (2011) ...................................................................... 38

*Doe v. Univ. of S. Ind.,*
43 F.4th 784 (7th Cir. 2022) ..................................................... 24, 25

*Farina v. Nokia Inc.,*
625 F.3d 97 (3d Cir. 2010) ............................................................ 47

*Farmworker Ass'n of Fla. v. Moody,*
734 F. Supp. 3d 1311 (S.D. Fla. 2024)............................................ 28

*FDA v. R. J. Reynolds Vapor Co.,*
145 S. Ct. 1984 (2025) ......................................................... 5, 6, 18

*FDA v. Wages & White Lion Inv. L.L.C.,*
604 U.S. 542 (2025) ...............................................................10, *passim*

*Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ...................................................................... 50

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers*
*Vacation Tr. for S. Calif.,*
463 U.S. 1 (1983) ......................................................................... 31

*Frank Adam Elec. Co. v. Westinghouse Elec. & Mfg. Co.,*
146 F.3d  (8th Cir. 1945) .............................................................. 55

*Ga. Atlas, Inc. v. Turnage,*
594 F. Supp. 3d 1339 (N.D. Ga. 2022)............................................ 29

*Garcia v. Wyeth-August Labs.,*
385 F.3d 961 (6th Cir. 2004) ......................................................... 40

*Geo Group Inc. v. Newsom,*
50 F.4th 645 (9th Cir. 2022) ......................................................... 44

*Grand River Enterprises Six Nations v. Knudsen,*
2024 WL 2992503 (9th Cir. 2024) ................................... 36

*Hines v. Davidowitz,*
312 U.S. 52 (1941) ................................... 38

*Hunafa v. Silwad,*
2012 WL 1945982 (M.D. Fla. May 10, 2012) ................................... 29

*Hyde v. C.R. Bard, Inc.,*
2018 U.S. Dist. LEXIS 155206 (D. Ariz. 2018) ................................... 39

*Ill. Republican Party v. Pritzker,*
973 F.3d 760 (7th Cir. 2020) ................................... 25

*Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue,*
2025 WL 1276006 (S.D. Iowa 2025) ................................... 22, 42

*Kallas v. Thompson,*
693 F. Supp. 3d 959 (N.D. Ind. 2023) ................................... 1

*Kansas v. Garcia,*
589 U.S. 191 (2020) ................................... 43

*Lofton v. McNeil Consumer & Specialty Pharm.,*
682 F.Supp. 2d 662 (N.D. Tex. 2010) ................................... 41

*Loreto v. Procter & Gamble Co.,*
515 Fed. Appx. 576 (6th Cir. 2013) ................................... 39

*Maryland v. King,*
567 U.S. 1301 ................................... 52

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) ................................... 33

*Munaf v. Geren,*
553 U.S. 674 (2008) ................................... 25

*Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence,*
731 F.3d 71 (1st Cir. 2013) ................................... 36

*Nexus Pharms., Inc. v. Cent. Admixture,*
Pharm., 48 F.4th 1040 (9th Cir. 2022) ................................... 39

*Nicopure Labs, LLC v. FDA,*
   944 F.3d 267 (D.C. Cir. 2019) ......................................................... 53

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................. 24, 25

*Novo Nordisk Inc. v. Live Well Drugstore, LLC,*
   2025 U.S. Dist. LEXIS 17792 (M.D. Fla. 2025) ........................................... 39

*Ohio Citizens for Responsible Energy, Inc. v. NRC,*
   479 U.S. 1312 (1986) ...................................................................... 24

*Orr v. Shicker,*
   953 F.3d 490 (7th Cir. 2020) ............................................................. 25

*Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.,*
   95 F.4th 501 (7th Cir. 2024) ............................................................. 31

*R.J. Reynolds Tobacco Co. v. City of Edina,*
   60 F.4th 1170 (8th Cir. 2023) .......................................................... 3, 36

*R.J. Reynolds Tobacco Co. v. County of Los Angeles,*
   29 F.4th 542 (9th Cir. 2022) .......................................................... 36, 46

*Regan v. Sioux Honey Ass'n Coop.,*
   921 F. Supp. 2d 938 (E.D. Wis. 2013) ..................................................... 40

*Rice v. Panchal,*
   65 F.3d 637 (7th Cir. 1995) ............................................................... 1

*Rice v. Santa Fe Elevator Corp.,*
   331 U.S. 218 (1947) ...................................................................... 33

*Scanlon v. Medtronic Sofamore Danek USA, Inc.,*
   61 F. Supp. 3d 403  (D. Del. 2014) ....................................................... 40

*Shondel v. McDermott,*
   775 F.2d 859 (7th Cir. 1985) ............................................................. 55

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ...................................................................... 31

*Turner Broadcasting Sys., Inc. v. FCC,*
   507 U.S. 1301 (1993) ..................................................................... 24

*United States v. Iowa,*
   126 F.4th 1334 (8th Cir. 2025) ...................................................... 43

*United States v. Iowa,*
   737 F. Supp. 3d 725 (S.D. Iowa 2024) ........................................ 28

*U.S. Smokeless Tobacco Manu. Co. v. City of New York,*
   708 F.3d 428 (2d Cir. 2013) ......................................................... 36

*Vanzant v. Hill's Pet Nutrition Inc.,*
   2025 U.S. Dist. LEXIS 12854 (N.D. Ill. 2025) ...................... 39–40

*Vapor Tech. Ass'n v. FDA,*
   977 F.3d 496 (6th Cir. 2020) ............................................... 6, 7, 14

*Vapor Tech. Ass'n v. Taylor,*
   2025 WL 348684, (E.D. Ky. Jan. 30, 2025) ............................ 21, 27

*Vapor Tech. v. Wooten,*
   2025 WL 1787420, (E.D.N.C., June 27, 2025) ............ 21, 22, 36, 41

*Virginia Uranium, Inc. v. Warren,*
   587 U.S. 761 (2019) ...................................................................... 38

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .......................................................................... 25

*Zyla Life Sciences, LLC v. Wells Pharma of Houston, LLC,*
   134 F. 4th 326 (5th Cir. 2025) ..................................................... 43

**Statutes**

21 U.S.C. § 321(rr)(1) ........................................................................ 5

21 U.S.C. § 331 ................................................................................... 4

21 U.S.C. § 333(a) .............................................................................. 4

21 U.S.C. § 337(a) ..................................................................1, *passim*

21 U.S.C. § 387b(6)(A) ....................................................................... 4

21 U.S.C. § 387j ..................................................................... 3, 4, 35

21 U.S.C. § 387j(a)–(c) ....................................................................... 4

21 U.S.C. § 387j(a)(1) ........................................................ 3

21 U.S.C. § 387j(a)(2)(B) ................................................... 4

21 U.S.C. § 387j(b)(1) ...................................................... 46

21 U.S.C. § 387j(c)(2)(A) .................................................. 4

21 U.S.C. § 387j(d)(4) ...................................................... 46

21 U.S.C. § 387p(a)(1) .................................... 4, 35, 44, 45

21 U.S.C. § 387p(a)(2)(A) ........................................... 44, 45

21 U.S.C. § 387p(a)(2)(B) ........................................... 44, 45

28 U.S.C. § 1292(a)(1) ....................................................... 1

28 U.S.C. § 1331 ................................................................ 1

Pub. L. No. 111-31, 123 Stat. 1776, 1777 (2009) ............... 4

Pub. L. No. 117-103, §111(a)(1) ........................................ 5

Wis. Stat. § 100.20 ......................................................... 19

Wis. Stat. § 100.20(2)–(4), (5) ....................................... 19

Wis. Stat. § 134.65(1a)(b) ............................................. 18

Wis. Stat. § 995.15 .................................................1, *passim*

Wis. Stat. § 995.15(2) ..................................................... 42

Wis. Stat. § 995.15(2)(a)–(b) ......................................... 19

Wis. Stat. § 995.15(6), (8) ............................................. 18

Wis. Stat. § 995.15(9) ..................................................... 18

Wis. Stat. § 995.15(9)(c) ................................................ 19

**Regulations**

21 C.F.R. § 1114.5 ............................................................... 4, 27, 30

81 Fed. Reg.  (effective Aug. 8, 2016)............................................ 4, 6

**Constitutional Provisions**

U.S. Const., art. VI, cl. 2............................................................ 1, 33

**Other Authorities**

Fed. Prac. & Proc. Juris. § 3531.4 (3d ed. 2023) ............................................. 27

# JURISDICTIONAL STATEMENT

Appellants' jurisdictional statement is not complete and correct. A complete and correct jurisdictional statement follows.

Appellants' complaint asserts a preemption claim under U.S. Const., art. VI, cl. 2 and an equal protection claim under U.S. Const. amnd. XIV, § 1. J.A. 0031–36. The district court had jurisdiction over these claims under 28 U.S.C. § 1331 by virtue of the equal protection claim.[1]

Appellants filed a motion for a preliminary injunction, seeking preliminary relief based on the merits of their preemption claim. J.A. 0196–234. The district court denied the motion on September 5, 2025. J.A. 1189–1110. Appellants filed a notice of interlocutory appeal that same day. J.A. 1111. This Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

# ISSUES PRESENTED

1. Whether the district court erred in holding that Appellants have no reasonable likelihood of success on the merits of their claim that 21 U.S.C. § 337(a) impliedly preempts Wis. Stat. § 995.15.

---

[1] Appellants indicate that jurisdiction under 28 U.S.C. § 1331 is conferred by their preemption claim, but "[f]ederal preemption ordinarily does not provide a basis for asserting federal jurisdiction over a claim." *Kallas v. Thompson*, 693 F. Supp. 3d 959, 965 (N.D. Ind. 2023) (citation omitted); *see also Rice v. Panchal*, 65 F.3d 637, 639 (7th Cir. 1995) ("Put another way, federal preemption that merely serves as a defense to a state law action (sometimes called 'conflict preemption') does not confer federal question jurisdiction.").

This Court should answer no and affirm.

2. Whether the district court abused its discretion in denying Appellants' motion for a preliminary injunction.

This Court should answer no and affirm.

## INTRODUCTION

In December 2023, Wisconsin enacted Wis. Stat. § 995.15, which limits the sale of electronic vape products by creating a state directory. One of the ways a manufacturer can have a product approved for the directory is by providing a premarketing approval order from the FDA. Many of the vape products on the market today have no such approval order; the vast majority are flavored nicotine products that present public health risks to children and teens. In deciding to regulate the sale of these tobacco products, Wisconsin acted consistently with Congress's express reservation of power to the States and local governments to regulate in the area of tobacco product sales.

Appellants filed a last-minute lawsuit to block Wisconsin's law before its September 1, 2025, enforcement date. Unlike other businesses selling vape products, which changed their inventory models in anticipation of the directory, Appellant businesses took virtually no steps to modify their product offerings, and many actively restocked unauthorized products as the September 1 date approached.

The district court denied Appellants' motion for a preliminary injunction, recognizing that their novel preemption claim does not have a strong likelihood of success on the merits, and concluding that the balancing of factors weighs against an injunction. They then sought an injunction pending appeal, and the district court denied that, too.

Appellants now ask this Court to reverse the district court's decision. But they offer no persuasive reasons why the district court erred in its assessment of their legal claim and don't explain why this Court should reject the district court's exercise of discretion. The district court's order should be affirmed.

## STATEMENT OF THE CASE

### I.    Factual background.

**A.    The federal Tobacco Control Act regulates tobacco products while expressly preserving States' authority to regulate the sale of such products.**

In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("TCA"), an amendment to the Food, Drug, and Cosmetic Act ("FDCA"), to require manufacturers to apply for and receive approval from the FDA before marketing any "new tobacco product." 21 U.S.C. § 387j.[2] The TCA responded to "growing concerns about adolescent tobacco use." *R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1173 (8th Cir. 2023) (citing Pub.

---

[2] The Act defines "new tobacco product" as one not commercially marketed in the United States as of February 15, 2007, or modified after that date. 21 U.S.C. § 387j(a)(1).

L. No. 111-31, 123 Stat. 1776, 1777 (2009)). Congress made clear that this expansion of federal oversight was not intended to supplant the States' traditional authority to regulate the sale of tobacco products by expressly preserving that authority in the Act's detailed preemption scheme. 21 U.S.C. § 387p(a)(1), (a)(2)(B).

Under the FDA's approval process, a manufacturer must submit a detailed premarket application to the FDA that identifies the product's components and all known information regarding its health risks. 21 U.S.C. § 387j. The FDA approves the application and issues a marketing approval order if it determines, among other things, that the product is "appropriate for the protection of the public health." 21 U.S.C. § 387j(c)(2)(A). In making this determination, the FDA considers "the risks and benefits to the population as a whole." J.A. 0093.

Until a new tobacco product has received a premarketing approval order from the FDA, it is illegal for sale. *See* 21 C.F.R. § 1114.5. Companies that sell new tobacco products without FDA approval face significant penalties. *See* 21 U.S.C. §§ 331, 333(a), 387b(6)(A), 387j(a)–(c).

In 2016, the FDA clarified that e-cigarettes qualify as tobacco products subject to the Tobacco Control Act. *See* 81 Fed. Reg. 28974 (effective Aug. 8, 2016) (also referred to as the "deeming rule"). Initially, some manufacturers interpreted this rule to encompass only e-cigarettes containing tobacco-derived

nicotine, not synthetic (non-tobacco-derived) nicotine. Congress closed that loophole in 2022, amending the Act to define "tobacco products" as products containing nicotine "from any source." *See* Pub. L. No. 117-103, §111(a)(1); 21 U.S.C. § 321(rr)(1).

Since the deeming rule went into effect on August 8, 2016, the FDA has reviewed and issued decisions on millions of e-cigarette product applications. J.A. 0920. As of March 1, 2025, the FDA has made determinations on 26,139,873 product applications, with fewer than 500,000 applications still pending. *Id*. And as of October 1, 2025, the FDA has authorized 39 e-cigarette products to be sold in the United States. *See U.S. Food & Drug Admin.*, Searchable Tobacco Products Database, https://www.accessdata.fda.gov/scripts/searchtobacco/ (last visited Oct. 2, 2025); J.A. 0976.

**B.** **The FDA enforces the law against sellers and distributors of unauthorized e-cigarette products, especially flavored products, which are most appealing to youth.**

**1.** **The FDA initially imposes a deferred enforcement period to allow e-cigarette manufacturers time to apply for and receive marketing authorizations; this period expires in September 2021.**

When e-cigarettes made their debut in the United States, the FDA initially did not treat them as "new tobacco products" for purposes of the TCA. *FDA v. R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1989 (2025). "They could therefore be sold without the FDA's approval, and over the years, a large market

developed." *Id.* In 2016, when the FDA determined that e-cigarettes qualified as tobacco products, all e-cigarettes on the market without FDA authorization became unlawful. *See* 81 Fed. Reg. 28974. To mitigate disruption and allow time for the industry to get into compliance, "the FDA announced that it would defer enforcement . . . against e-cigarette manufacturers and retailers while the manufacturers sought FDA approval." *R. J. Reynolds Vapor Co.*, 145 S. Ct. at 1989 (citing 81 Fed. Reg. 29009–29015 (2016)).

The FDA initially set a deadline of August 8, 2018, for the submission of premarket applications. *Vapor Tech. Ass'n v. FDA*, 977 F.3d 496, 498 (6th Cir. 2020) (citing 81 Fed. Reg. at 29,010–11, 29,106). In May 2017, the FDA extended the compliance period by three months. *Id.* (citing 82 Fed. Reg. 22,338, 22,340 (May 15, 2017)). In August 2017, the FDA extended the compliance period to August 2022. *Id.* The August 2017 guidance was issued without notice and comment. *Id.*

In July 2019, in a case initiated by several public health organizations, the U.S. District Court for the District of Maryland vacated the FDA's August 2017 guidance and ordered the FDA to require e-cigarette manufacturers to submit premarket applications by May 12, 2020. *Am. Acad. of Pediatrics v. FDA*, 399 F. Supp. 3d 479, 480–86 (D. Md. 2019). The court concluded that it had the authority to impose this remedy given "the extraordinary circumstances" of the case, including the "recalcitrance" of the e-cigarette industry to get into

compliance, the continued availability of e-cigarettes, and "the clear public health emergency" caused by youth e-cigarette use. *Id.* at 486 (citation omitted). The injunction further provided that e-cigarette products with timely filed applications "may remain on the market without being subject to FDA enforcement actions for a period not to exceed one year from the date of application while FDA considers the application." *Id.* at 487.

The court later amended its injunction at the request of the FDA, extending the submission deadline to September 9, 2020. *Vapor Tech. Ass'n*, 977 F.3d at 500; J.A. 0451. The FDA's court-ordered deferred enforcement period—one year from the date of application—remained in place, expiring as of September 9, 2021. *See* J.A. 0451.

### 2. In 2020, the FDA recognizes the public health crisis of youth e-cigarette use driven by flavored products and announces it will prioritize its enforcement efforts on those products.

In January 2020, the FDA published guidance for the e-cigarette industry to communicate its enforcement priorities regarding unauthorized e-cigarette products. J.A. 0089, 0091.[3] The guidance described the mounting public health crisis of youth e-cigarette use; identified flavored e-cigarette products as most

---

[3] The FDA's January 2020 guidance was revised in April 2020 with minor modifications and to reflect the district court's 120-day extension of the compliance period to September 9, 2020, in *Am. Acad. of Pediatrics v. FDA*, 399 F. Supp. 3d 479 (D. Md. 2019). J.A. 0120–21.

appealing to youth; and announced that it would prioritize its enforcement efforts against those products.[4] J.A. 0089–121.

In the guidance, the FDA described evidence showing "an alarming increase" in the use of e-cigarette products by middle and high school students, as well as an increase in lung injuries from use of vaping products. J.A. 0095–98. As of December 2019, "there ha[d] been approximately 2,506 reported cases of hospitalizations for lung injuries associated with use of vaping products . . . including 54 confirmed deaths." J.A. 0097–98. The FDA explained that "the outbreak of lung injuries associated with use of vaping products illustrates the public health and safety concerns" and "affirms the importance of the premarket review process." J.A. 0098.

The FDA also described research indicating that e-cigarettes pose unique health risks for young users. Specifically, certain effects of nicotine salts in e-cigarette products (e.g., higher nicotine exposure and faster rate of absorption) may increase the abuse liability of those products and raise heightened addiction risk for youth, "particularly due to the vulnerability of the developing adolescent brain." J.A. 0109. The FDA's concerns were compounded by evidence showing that youth who begin smoking e-cigarettes are at an increased risk of later smoking combustible tobacco cigarettes. J.A. 0102.

---

[4] In the e-cigarette context, a flavored e-cigarette product refers to a product in a flavor other than tobacco or menthol, such as dessert, fruit, and candy flavors.

The FDA linked the rise of youth use of e-cigarettes with "the extraordinary popularity" of flavored products, noting research showing that flavor is a significant driver of youth appeal. J.A. 0102–03 (In one study, 71% of youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."). Research further indicated that, at that time, flavored, cartridge-based products—products that "are easy to conceal, can be used discreetly, may have a high nicotine content, and are manufactured on a large scale"—were most popular with youth. J.A. 0104. Given this data, the FDA prioritized its enforcement resources at that time on those products. J.A. 0107–120.

The guidance acknowledged that enforcement prioritization was a resource limitation issue:

> FDA will make enforcement decisions on a case-by-case basis, recognizing that it is unable, as a practical matter, to take enforcement action against every illegally marketed tobacco product, and that it needs to make the best use of Agency resources. FDA intends to prioritize enforcement based on the likelihood of youth use or initiation to make the most efficient use of its resources.

J.A. 0120. The FDA also emphasized that "[t]his guidance goes not in any way alter the fact that it is illegal to market any new tobacco product without premarket authorization." J.A. 0092.

**3. In 2021, the FDA issues a mass denial of over a million premarket applications for flavored e-cigarette products based on its assessment of the risks to youth.**

By 2021, the FDA began denying premarket applications for flavored e-cigarette products en masse based on its conclusion that the public health harms of such products generally outweigh any benefits to transitioning cigarette smokers, given their strong appeal to youth. *See FDA v. Wages & White Lion Inv. L.L.C.*, 604 U.S. 542, 562–63 (2025).

In *Wages & White Lion Investments*, the U.S. Supreme Court considered a challenge to the FDA's decision to deny premarket applications for certain flavored e-cigarette products—applications that were among a mass denial of over one million applications for similar flavored products.[5] *Id*. at 548. The FDA had denied the product applications because it determined that the manufacturers had not provided evidence showing that "their dessert-, candy-, and fruit-flavored products" had public health benefits that outweighed the risks to young people. *Id*. at 562–63. The denials reflected FDA's "evolving understanding of how flavor, regardless of e-cigarette device type, drives youth smoking initiation and nicotine addiction." *Id*. at 563. Based on scientific research, the FDA had concluded "that flavors make e-cigarette smoking 'more

---

[5] The named plaintiff, Wages and White Lion Investments L.L.C.*,* is also a plaintiff in this case.

10

palatable for novice youth and young adults' and may 'increase nicotine exposure by potentially influencing the rate of nicotine absorption.'"[6] *Id.* (citation to appendix omitted). The Court unanimously held that the FDA had not acted arbitrarily or capriciously by denying these applications. *Id.* at 592.

To date, the FDA has not issued any marketing approval orders for flavored e-cigarette products; the 39 e-cigarette products that have been authorized by the FDA are tobacco- or menthol-flavored. *See U.S. Food & Drug Admin.*, Searchable Tobacco Products Database, https://www.accessdata.fda. gov/scripts/searchtobacco/ (last visited Oct. 2, 2025).

> **4.  The FDA's current guidance makes clear that the FDA is actively enforcing the law against unauthorized products.**

The FDA publishes current guidance for the e-cigarette industry on its website. On a webpage titled "Advisory and Enforcement Actions Against Industry for Unauthorized Tobacco Products," the FDA emphasizes:

> Enforcing against unauthorized ENDS products, including unauthorized products popular with youth, are among our highest enforcement priorities.
>
> A new tobacco product must have FDA authorization before it can be legally marketed, and generally, products without authorization are at risk of enforcement action.

---

[6] Many vape products are appealing to youth not only because of their flavors—such as Strawberry Ice Cream, Birthday Cake, Orange Soda, and Cotton Candy—but also their packaging, which may include cartoon characters or celebrities. J.A. 0961 ¶ 7, 0966–70.

> FDA *has not adopted a broad policy of enforcement discretion* regarding tobacco products without marketing authorization. For the vast majority of unauthorized e-cigarettes on the market today*, the pendency of an application does not create a legal safe harbor to sell that product.*

J.A. 0977 (emphasis added). The FDA's website also describes its recent and increasing efforts to stop the illegal sale and distribution of unauthorized e-cigarettes:

- In May 2023, the FDA announced a "nationwide blitz" to curb illegal sales of unauthorized e-cigarettes, conducting inspections of hundreds of retailers and distributers. The press release explained: "[t]he FDA remains steadfast in its commitment to protecting youth from the harms of tobacco products by ensuring illegal products are not marketed, sold, or distributed. These efforts include ongoing surveillance of the marketplace to identify violative products . . .." J.A. 0990–91.

- In June 2024, the FDA and U.S. Department of Justice announced a new multi-agency federal task force focused on e-cigarette enforcement. The purpose of the task force is "to coordinate and streamline efforts to bring all available criminal and civil tools to bear against the illegal distribution and sale of e-cigarettes responsible for nicotine addiction among American youth."  J.A. 0992–94.

- In October 2024, the FDA announced that, in a joint operation with U.S. Customs and Border Protection, it had seized approximately three million units of unauthorized e-cigarette products with an estimated retail value of $76 million. J.A. 0995–96.

- In December 2024, the FDA issued warning letters to 115 brick-and-mortar retailers for selling unauthorized e-cigarette products. To date, the FDA has issued more than 800 warning letters to retailers. J.A. 0978.

- In January 2025, in another joint operation, the FDA seized more than 628,000 unauthorized e-cigarette products from a warehouse in Miami. "This seizure is another example of coordinated enforcement actions across federal agencies to curb the distribution and sale of illegal e-cigarettes." J.A. 0998–99.

- In May 2025, in another joint operation, the FDA seized nearly two million units of unauthorized e-cigarette products in Chicago with an estimated retail value of $33.8 million. J.A. 1000–01.

Appellants assert that the "FDA has exercised enforcement discretion with respect to certain ENDS products and has not required their removal from the market despite their lack of an FDA marketing order." (7th Dkt. 18:2.)[7] But since the compliance period expired in September 2021, there is no evidence that the FDA has exercised discretion to allow any unauthorized e-cigarette products to remain on the market notwithstanding the lack of an FDA marketing order.

Similarly, Appellants assert that the FDA has "made the 'deliberative choice' to leave many unauthorized ENDS products on the market by deferring enforcement." (7th Dkt. 18:35–36 (quoting *Arizona v. United States*, 567 U.S. 387, 405 (2012), a case that does not concern tobacco products).) This assertion is likewise inaccurate; Appellants cite no evidence supporting a "deliberative choice" by the FDA to leave certain unauthorized products on the market, and it contradicts the FDA's stated policy of active enforcement.

Appellants also suggest that the FDA exercises enforcement discretion because of "the FDA's view that removing all unauthorized ENDS from the market too quickly 'creates a genuine risk of migration from potentially less

---

[7] Appellee's pin cites to Appellants' brief are to the page numbers at the bottom of each page, beginning with page 1 at the brief's "Introduction."

harmful [e-cigarette] products back to combustible tobacco products.'" (7th Dkt. 18:7 (citing *Vapor Tech Ass'n*, 977 F.3d at 499 (quoting *Am. Acad. of Pediatrics*, 399 F. Supp. at 484–85)).) Here, Appellants are quoting an FDA director's statement from 2019, made at a time when the FDA had not yet approved any e-cigarette products for marketing. *See Am. Acad. of Pediatrics*, 399 F. Supp. at 484–85 Appellants cite no evidence that the FDA is currently concerned about the risk of migration if unauthorized e-cigarettes are removed from the market.

### C.  Appellant businesses specialize in the sale of unauthorized, flavored nicotine vape products.

The Appellant retailers are specialty vape shops that feature flavored nicotine vape products—all of which are unauthorized by the FDA and thus illegal for sale.[8]

David Beaupre, president of The Supply Plus, testified that "99 percent" of the nicotine vape products in his store are flavored products.[9] J.A. 1025 (Tr. 8:6–19). Pradeep Patel, owner of Nara Smoke Shop, asserted that 83% of his store's overall revenue comes from sales of nicotine vape products, and a

---

[8] Appellant Wages and White Lion Investments, LLC, is a manufacturer of flavored e-liquid products but, unlike the retailer Appellants, does not allege irreparable harm as a result of Wisconsin's vape directory law. *See* J.A. 0271–72.

[9] In each deposition, the witness confirmed his or her understanding that a "flavored" nicotine vape product means a flavor other than tobacco or menthol.

majority of those products are flavored. J.A. 0882 ¶ 8, 1074 (Tr. 10:3–25). Patricia Arnold, owner of Crescent City Vapes and a member of the Appellant trade association, testified that 75% of her nicotine vape inventory is flavored. J.A. 1055 (Tr. 8:16–9:4). And Tyler Hall, president of Johnny Vapes, testified that his nicotine vape products include "hundreds of flavors." J.A. 0844 (Hr'g Tr. 90:2–3); 0950 ¶ 9 (confirming that his inventory is mostly flavored products).)

Appellants' product inventories are consistent with the product offerings of vape shops in Wisconsin prior to the law's effective date. In August 2025, excise tax auditors for the Wisconsin Department of Revenue estimated—based on their regular auditing of tobacco and vapor products brought into the state for sale—that 95% of all nicotine vape products sold at vape shops in Wisconsin were flavored with fruit, dessert, or candy flavors rather than tobacco or menthol.[10] J.A. 0950 ¶ 8, 0957 ¶ 9.

Some Appellants recognize the risk in selling illegal products and the obligation to follow the law, although they assert unawareness regarding the legality of their products.

---

[10] To illustrate, the nicotine vape product inventory at Appellants Johnny Vapes and The Supply Plus includes flavors such as Tropical Rainbow Blast, Watermelon Ice, Vanilla Ice Cream, Cotton Candy, Strawberry Cream, Peach Berry, Mandarin Lime, Watermelon Bubble Gum, Malibu, Tripple Berry Ice, Strawberry Kiwi, Sour Apple, Lemon Mint, Cranberry Grape, Blue Raspberry Ice, Rainbow Cloudz, Strawberry Pina Colada, and Watermelon Cantaloupe Honeydew. J.A. 0950 ¶ 9.

Jamal Abujad, managing member of Distro Guys Wholesale, testified that he understands that it is illegal under federal law to sell a tobacco product that does not have FDA approval. J.A. 0818 (Hr'g Tr. 64:10–13). Without conceding that his own non-FDA-approved products are illegal, he acknowledged that there is an inherent risk in a business model that depends on the sale of illegal products. J.A. 0819 (Hr'g Tr. 65:18–25). He is "hoping that the FDA does do more laws so we can be able to sell everything legally." J.A. 0821 (Hr'g Tr. 67:9–11).

Patel testified that he chooses not to personally investigate whether his products are legal for sale, even though he understands that, as a business owner, he has an obligation to be aware of relevant laws and to follow them; he reflected that he should be "more inquisitive." J.A. 1044 (Tr. 7:21–9:6).

Beaupre acknowledged that he was aware of the FDA's enforcement efforts against some of his product brands (e.g., Geek Bar, VooPoo, Fifty Bar, and Juice Head) because he follows the FDA website; however, Beaupre testified that he will remove unauthorized product from his shelves only if the *specific* style—e.g., Geek Bar Pulse Disposable 5% Mintz Edition: Creamy Mintz—was the subject of a warning letter. J.A. 1029 (Tr. 24:12–20); *see also* 1003–21 (sample FDA warning letters).

Hall admitted that he is aware that the FDA has never approved a flavored e-cigarette product for sale and understands that the FDA is "trying to limit it to the menthol and tobacco flavor, strictly." J.A. 0850 (Hr'g Tr. 96:7–10, 21–25). Despite this awareness and despite selling mostly flavored products, Hall claimed that he does not know which of his products are legal for sale under federal law, though he "would assum[e] all." J.A. 0832 (Hr'g Tr. 78:8–12). Hall explained that customers like certain products, and "we sell what the customer's looking for," without confirming whether those products have been approved by the FDA. J.A. 0834 (Hr'g Tr. 80:3–12).

**D.    Wisconsin exercises oversight over the retail sale of smoking products in Wisconsin and, on December 6, 2023, enacts the vape directory law.**

Wisconsin has long exercised oversight over the sale of smoking products such as cigarettes. On December 6, 2023, Wisconsin extended its regulation to electronic vaping devices by enacting 2023 Wis. Act 73, which created Wisconsin's "[e]lectronic vaping device directory." *See* 2023 Wis. Act. 73; Wis. Stat. § 995.15. Wisconsin defines "[e]lectronic vaping device" broadly as any device that may be used to deliver an "aerosolized or vaporized liquid or other substance for inhalation," regardless of whether it contains nicotine,

17

such as an "e-cigarette, e-cigar, e-pipe, vape pen, or e-hookah." Wis. Stat. § 134.65(1a)(b).[11]

Under Wis. Stat. § 995.15, the Wisconsin Department of Revenue is required to create an electronic vaping device directory and enforce penalties on retailers and manufacturers who sell or offer to sell devices that are not on the directory. Wis. Stat. § 995.15(6), (8). Manufacturers of electronic vaping devices apply to have their devices appear on the directory, which went into effect by statute on September 1, 2025. As of that date, only electronic vaping devices on the directory may be offered for sale in Wisconsin, except for devices containing hemp but not nicotine, which have been given an additional year to comply. Wis. Stat. § 995.15(9); 2025 Wis. Act 15 §§ 352–54.

To qualify for the directory, a device must fall within one of three categories: (1) it has received an FDA premarketing authorization order; (2) has a still-pending premarket tobacco product application that was submitted to the FDA on or before September 9, 2020; or (3) it contains hemp but not nicotine, and

---

[11] Appellants spend many pages complaining that RJ Reynolds supported the legislation that became Wis. Stat. § 995.15. But Reynolds was itself no fan of state and local sales regulation that result in prohibiting flavored vape products, fighting them unsuccessfully in multiple rounds of litigation. *See infra* at 37–38. And it continues to challenge the FDA's rejections of its own product application. *See, e.g., FDA v. R.J. Reynolds Vapor Co.*, 145 S. Ct. 1984 (2005) (involving judicial review of FDA denial for premarket approval of R.J. Reynolds products).

the manufacturer provides a certificate of analysis from an independent laboratory. Wis. Stat. § 995.15(2)(a)–(b); 2025 Wis. Act 15, §§ 352–54.[12]

### E. Wisconsin spends 19 months preparing to implement the directory law and educating the public; the regulated industry also prepares.

Following the enactment of Act 73 and over the course of a year and a half, the Department worked diligently to prepare for and implement the directory. This included developing internal processes to implement the law, training tax auditors and agents, and performing extensive outreach. J.A. 0330, 0455–60 ¶¶ 4–17. The Department informed the public and the regulated industry about the directory law through publications, webinars, seminars, notices to manufacturers, and notices to distributors. J.A. 0455–60 ¶¶ 4–17. Since December 2023, the Department has responded to more than 1,125 phone calls and 361 written inquiries regarding the directory. J.A. 0330 ¶ 7.

Concurrently, the industry also prepared. Vape retailers prepared by adjusting their inventories to eliminate unauthorized product and ensure that sufficient legal product would be available for sale on their premises (*see*, *e.g.*, J.A. 0453 ¶ 5, 0951 ¶ 8, 0962 ¶ 10), and manufacturers prepared by registering

---

[12] Appellants' brief does not mention the hemp category for inclusion on the directory. Appellants also misstate the statute's enforcement provisions; a person may file suit against a competitor for unfair trade practices only if Wisconsin's Department of Agriculture, Trade and Consumer Protection issues an order under Wis. Stat. § 100.20 determining, after a public hearing, that such a violation has occurred. Wis. Stat. § 995.15(9)(c); Wis. Stat. § 100.20(2)-(4), (5).

and applying to have their vaping devices placed on the directory. J.A. 0331 ¶ 11.

Wisconsin's electronic vaping device directory is published on the Department's website. *See Wis. Dept. of Revenue*, Electronic Vaping Device Directory, https://www.revenue.wi.gov/Pages/OnlineServices/electronic -vaping-device-directory.aspx (last visited Oct. 2, 2025). As of October 1, 2025, the directory contains 284 electronic vaping devices that are approved and eligible for retail sale in Wisconsin.

### F. Appellant businesses choose to continue to stock unauthorized products.

Despite the long lead time, Appellant retailers did not take steps to alter their inventories in preparation for the directory law and instead continued to stock unauthorized products.

Abujad testified that he had known about the directory law for about four months but had "done nothing really" to prepare his business and inventory for the changes. J.A. 0821 (Hr'g Tr. 67:4–11).

Beaupre testified that he has been aware of the directory law since January 2025. J.A. 1025 (Tr. 9:3–7). As of his deposition on August 12, 2025, he had not tried to sell off inventory that is ineligible for the directory and was still purchasing and ordering products for his customers as usual. J.A. 1026 (Tr. 10:9–11:22). This includes restocking flavored products, and he stated that he

intended to continue selling those products so long as he could access them. J.A. 1026 (Tr. 11:3–22).

Hall likewise admitted that he has known about the directory law since February 2025 but had done nothing to prepare his business other than prepare to file this lawsuit. J.A. 0840 (Hr'g Tr. 86:10–87:1) ("for the most part, stayed business as usual").

Patel has been aware of the directory law for five or six months but, as of August 12, 2025, had not taken "any" steps to prepare for it. J.A. 1044 (Tr. 6:6–9).

## II.   Procedural history.

Multiple states have enacted directory laws like Wisconsin's that permit the sale of vape products that have an FDA premarket approval order, eliciting challenges from the vape industry. In *Vapor Tech. Ass'n v. Taylor*, 2025 WL 348684, (E.D. Ky. Jan. 30, 2025), the district court dismissed a challenge to Kentucky's directory law for lack of Article III standing because the plaintiffs had no legally protected interest in selling unlawful products. Counsel for Appellants has brought suits like the case here in at least two states, with dueling outcomes. In *Vapor Technology v. Wooten*, 2025 WL 1787420, (E.D.N.C., June 27, 2025), the district court declined to grant a preliminary injunction to enjoin North Carolina's directory, rejecting the same preemption arguments. The Fourth Circuit declined to grant an injunction pending appeal.

*Vapor Technology v. Wooten*, No. 25-1745, (8th Cir., July 28, 2025); on September 22, 2025, 28 states filed an amicus in support of North Carolina. 2025 WL 2753811. In *Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Department of Revenue*, 2025 WL 1276006 (S.D. Iowa 2025), the district court granted a preliminary injunction where the parties had agreed to stay enforcement of Iowa's directory law pending the court's decision. There was no request for a stay pending the appeal of that order, and so the Eighth Circuit has not yet weighed in.

Here, on June 30, 2025—almost 19 months from when Wisconsin's law was enacted—Appellants filed a lawsuit to challenge the legality of Wis. Stat. § 995.15. J.A. 0011. The lawsuit asserted that Wis. Stat. § 995.15 is preempted and violates their equal protection rights. J.A. 0031–36. On July 8, 2025—just eight weeks from the directory's September 1 effective date—Appellants moved for a preliminary injunction on preemption grounds. J.A. 0196–234.

The district court denied Appellants' motion. J.A. 1089–1110. The court concluded that Appellants did not make a strong showing of the likelihood of success on the merits and that the balancing of the equities weighed against the relief they sought. J.A. 1104–07, 10. Appellants moved for an injunction pending appeal, and the district court denied that motion as well. J.A. 1137–39.

Meanwhile, Appellee moved to dismiss the Complaint for lack of jurisdiction and failure to state a claim. (Dkt. 34; 35.) That motion is fully briefed.

## SUMMARY OF THE ARGUMENT

The district court properly exercised its discretion in denying Appellants a preliminary injunction to block Wisconsin's public health law. Appellants fail to make a strong showing they will prevail: they lack standing to bring suit, and their preemption claim ignores the presumption against preemption; casts aside the Preservation and Savings Clauses in the Tobacco Control Act, which preserve state and local authority to regulate the sale of tobacco products; and misunderstands what the enforcement provision in 21 U.S.C. § 337(a) actually does.

On the balancing of equities, the harms to the State and public outweigh Appellants' interest in profiting from the sale of products that are illegal under federal law. An injunction would temporarily strike a validly enacted public health law that helps keep dangerous products away from children and young adults, and would harm competitors who, unlike Appellants, made changes in their inventory in anticipation of the new law. As the district court concluded, Appellants' 19-month delay in bringing suit also weighs against an injunction. And the unclean hands doctrine, which avoids preliminary injunctions that further illegal conduct, further tips the balance against Appellants' request.

**STANDARD OF REVIEW**

Appellants seek extraordinary relief pending appeal, and the standard for that relief is accordingly daunting. A stay "simply suspend[s] judicial alteration of the status quo," while injunctive relief "grants judicial intervention that has been withheld by lower courts." *Nken v. Holder*, 556 U.S. 418, 429 (2009) (citing *Ohio Citizens for Responsible Energy, Inc. v. NRC,* 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers); *see also Brown v. Gilmore,* 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers) ("[A]pplicants are seeking not merely a stay of a lower court judgment, but an injunction against the enforcement of a presumptively valid state statute"); *Turner Broadcasting Sys., Inc. v. FCC,* 507 U.S. 1301, 1302 (1993)).

This Court reviews the district court's denial of a motion for injunction pending appeal under a mixed standard: it reviews its findings of fact for clear error, its legal conclusions *de novo*, and its balancing of the factors for a preliminary injunction for abuse of discretion. *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022).

# ARGUMENT

**The district court properly exercised its discretion in denying Appellants' motion for a preliminary injunction.**

A preliminary injunction is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008), and a "very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2020) (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)). The party seeking the injunction must establish *all* of the relevant factors: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). When, as here, the government is a defendant, the balance of harms and public interest factors "merge." *Nken*, 556 U.S. at 435.

In this Circuit, the first two factors are considered "threshold" factors, *Cassell*, 990 F.3d at 545, and the first factor—likelihood of success on the merits—"is often decisive." *Doe*, 43 F.4th at 791. Under this prong, the movant "must make a strong showing" that they are likely to succeed on the merits. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020).

**I.     Appellants make no strong showing that they are likely to prevail on the merits.**

Appellants' preemption claim does not have strong prospects. There is no Article III jurisdiction to begin with. As to the merits, Appellants ignore the relevant presumption against preemption, discount that Congress expressly preserved States' ability to regulate the sales of tobacco products, and misunderstand the scope of 21 U.S.C. § 337(a).

**A.     Appellants lack Article III standing.**

Appellants concede that the many products they wish to sell are illegal for sale in the United States. None have standing to sue under Article III to buy or sell such products: regardless of the outcome of this litigation, the products will still be illegal, and courts recognize no protected interest in engaging in that conduct.

**1.     A plaintiff lacks standing to bring suit to facilitate participating in an activity that, regardless of the suit's outcome, is illegal.**

To demonstrate an injury in fact, a plaintiff must assert an injury to an interest that the law protects when it is wrongfully invaded by the law or acts challenged by the complaint. *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006). Courts have routinely held that plaintiffs lack standing to engage in conduct that, regardless of the outcome of their lawsuit, would still be illegal.

For example, in *Bell v. American Traffic Solutions, Inc.*, 371 F. App'x 488, 490 (5th Cir. 2010), the court concluded that drivers who ran red lights lacked standing to sue traffic camera installers who made the detection of their civil infractions more likely. And in *Taylor*, 2025 WL 348684, at *2, the district court concluded that the plaintiffs had no standing to challenge Kentucky's law because their product was unlawful for sale under federal law: "[u]ltimately, the Court is not persuaded by Plaintiffs' attempt to shift its legally protected interest from selling unlawful products to being free from alleged unlawful state regulation." *Id.* at *3; *see also* 13A C. Wright, A. Miller, & E. Cooper, Fed. Prac. & Proc. Juris. § 3531.4 (3d ed. 2023) ("[s]tanding would not be recognized for a smuggler who asserted that his drug traffic was disrupted. Although the smuggler had been injured in fact, and the inspection procedures might indeed be unlawful, the asserted interest is not one the courts will protect.").

That is the case here. Electronic nicotine products without an FDA premarketing authorization order are illegal for sale in the United States. 21 C.F.R. § 1114.5; *Wages & White Lion Inv., L.L.C.*, 604 U.S. at 555 ("because those products had not received premarket authorization, the effect of the [FDA] rule was to make their continued sale illegal"). The Complaint acknowledges this reality. J.A. 0014, 0032 (Compl. ¶¶ 13, 81–84).

Appellants' suit simply seeks to enable them to buy and sell products that are illegal for sale under federal law—regardless of the outcome of this lawsuit. That is not a protected interest under Article III.

> **2.** **This case is not like those relied on by Appellants, where a victory would make their conduct legal.**

Below, Appellants argued about a problem not at issue here: standing theories that conflate the protected interest requirement with whether plaintiffs will succeed on the merits. (Dkt. 75:22.) Here, regardless of the outcome of the case, the many products they wish to buy and sell will still be illegal for sale under federal law.

The cases Appellants relied on presented the opposite scenario: situations where judicial relief would remove any illegality about the conduct in question. In *United States v. Iowa*, 737 F. Supp. 3d 725, 735 (S.D. Iowa 2024), the immigrant plaintiffs were lawful permanent residents under federal law, which would provide them a defense to any charge of illegal reentry. They challenged an Iowa statute with no such defense, putting them at risk for state prosecution; if the court struck the state law, their conduct was legal. *Id.* at 742. And in *Farmworker Association of Florida v. Moody*, 734 F. Supp. 3d 1311, 1319, 1321 (S.D. Fla. 2024), advocates gave rides to immigrants for purposes like medical appointments and visiting family, an activity legal under federal

law. They challenged a Florida statute that criminalized that activity; again, if the court granted that relief, their conduct was entirely legal. *Id.* at 1322.

Here, Appellants seek the ability to resume selling and buying products that are illegal for sale under federal law. J.A. 0032 (Compl. ¶ 84). The products will remain illegal for sale regardless of the outcome of the case, and there is no protected interest in that commerce. *See Hunafa v. Silwad*, 2012 WL 1945982, at *2 (M.D. Fla. May 10, 2012) (dismissing because plaintiff lacked legal right to purchase individual cigarettes); *cf. Ga. Atlas, Inc. v. Turnage*, 594 F. Supp. 3d 1339, 1344 (N.D. Ga. 2022) (no standing because plaintiffs "have no federal constitutional or statutory right" to possess marijuana, regardless of their claims under state law).

> ### 3. No evidence supports a conclusion that FDA has decided to treat any of the vape products Appellants sell as legal.

In holding that Appellants had a reasonable likelihood of success regarding standing, the district court said that "plaintiffs have a legitimate basis for believing that the FDA will continue its practice of allowing the ENDS market to grow." J.A. 1096–97. While counsel for Appellants made arguments to that effect during the preliminary injunction hearing, (J.A. 0789–90 (H'rg Tr. 35:13–25, 36:1–11 (agreeing with the incorrect premise that plaintiff manufacturer could sell its unauthorized synthetic nicotine e-liquid in Wisconsin "without . . . running a risk of FDA enforcement")); 0865 (H'rg Tr.

111:6–11 ("What we have is . . . a clear record of FDA-deferred enforcement, FDA discretion."))), neither the Complaint's allegations nor the evidence in the preliminary injunction filings supported such assertions.

The Complaint acknowledges that the products are illegal for sale under 21 C.F.R. § 1114.5. J.A. 0014, 0032 (Compl. ¶¶ 13, 81–84). The Complaint referenced a statement in the FDA's 2020 guidance about "case-by-case" enforcement choices, (J.A. 0034 (Compl. ¶ 54.g. (citing Compl. Ex. F)), but that guidance said nothing conferring permission to sell—it was just a recognition that the FDA could not cover all bases at once. FDA recognized "that it is unable, as a practical matter, to take enforcement action against every illegally marketed tobacco product," and has needed to make enforcement choices that make best use of its resources. J.A. 0120. That is what the *Wages & White Lion* Court concluded when the plaintiffs there complained that the FDA had changed its position between 2020 and 2025: "nothing in the 2020 guidance suggested the FDA would decline to take enforcement action against other products." 604 U.S. at 583. And, as discussed above, the FDA's current guidance for the industry conveys the opposite of Appellants' premise.

There is no factual support in the record for a conclusion that FDA has chosen to permit the sales of unauthorized vape products.

### 4. Federal courts have limited jurisdiction under Article III, and not every claim is within the federal courts' power to decide.

Finally, Appellants advocated for a functional standing test: that because a lack of Article III standing would deny them their ability to bring a declaratory judgment case in federal court to seek facial invalidation of the law, the Court must simply find standing so that they will be able to sue. (Dkt. 75:25–26, 27.)

Because federal courts are courts of limited jurisdiction, not every claim will come within the federal court's power to decide. *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.,* 95 F.4th 501, 504 (7th Cir. 2024) ("No matter how important a legal question or how sincere a worry, we must ensure the presence of a Case or Controversy.") Indeed, without Appellants' tag-on equal protection claim, this Court would have no jurisdiction to consider their preemption claim, even apart from the lack of standing: "if, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Calif.,* 463 U.S. 1, 16 (1983). Appellants have suggested there is standing for any declaratory judgment claim seeking anticipatory relief, but that is simply not so; the case they pointed to, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), (Dkt. 75:27), says nothing supporting that idea.

As Appellants recognize, (Dkt. 75:27), the fact that they lack Article III standing does not mean they lack any remedy. If the State brought an enforcement case against one of them in state court, they could assert preemption as a defense. But they do not have Article III standing here.

**B.  Appellants have made no strong showing that their preemption claim will prevail.**

Even if this Court had jurisdiction, Appellants make no strong showing that the preemption claim will prevail: it ignores the presumption against preemption, discounts the TCA's explicit preservation of state authority to prohibit and regulate tobacco product sales, and misunderstands the enforcement clause in the FDCA, 21 U.S.C. § 337(a), which merely requires the United States to bring claims that will adjudicate whether the FDCA has been violated. Their enforcement discretion theory has been roundly rejected by courts. And their express preemption argument, not pled in their Complaint, ignores the plain language of the TCA.

**1.  Preemption depends on congressional intent, and Appellants' theories ignore the presumption against preemption here.**

Appellants' theories ignore the presumption against preemption, where Wisconsin is regulating in an area traditionally left to the States.

The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of

32

any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. Accordingly, "federal law preempts contrary state enactments." *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010) (citation omitted). The scope of a statute's preemptive effect is guided by congressional intent: "the purpose of Congress is the ultimate touchstone" in every pre-emption case. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996)). And Congress does not "cavalierly pre-empt" state law. *Medtronic, Inc*, 518 U.S. at 485.

When Congress has decided to legislate in an area the States have traditionally occupied, preemption analysis starts "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Grp., Inc.*, 555 U.S. at 77 (alteration in original) (quoting *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947)). That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States, like tobacco sales. *Id.* at 77. If a preemption clause is susceptible to more than one plausible reading, courts must "accept the reading that disfavors pre-emption." *Id.* (citation omitted). Appellants never reckon with the presumption against preemption.

### 2. 21 U.S.C § 337(a) does not impliedly preempt Wisconsin's statute.

Appellants' implied preemption theory, based on 21 U.S.C. § 337(a), is unsupported by the statute and cases applying it, for two fundamental reasons. First, the provision cannot be interpreted to implicitly preempt state laws imposing sales restrictions on tobacco products because Congress has said they are *not* preempted. Second, more generally, the provision prohibits only causes of action that would require courts to adjudicate whether provisions of the FDCA have been violated. Wisconsin Stat. § 995.15 requires no determination of whether someone is violating a relevant provision of the TCA.

### a. In the context of the Tobacco Control Act, the Preservation and Savings Clauses command that state sales restrictions like Wisconsin's are not preempted.

In the context of the TCA, § 337(a) must be interpreted in light of that statute's Preservation and Savings Clauses. Those provisions preserve States' ability to regulate the sale of tobacco products, including more strictly than under federal law. Appellants' proposed, novel reading of § 337(a) violates that congressional command.

Reflecting the States' historical role in prohibiting tobacco sales and in avoiding harm to young people, the TCA preserves the States' ability to regulate the sale of tobacco products, preempting only a narrow band of non-sale regulation. When Congress enacted the TCA, requiring

manufacturers to apply for and receive approval from the FDA before marketing any "new tobacco product," 21 U.S.C. § 387j, it made clear that this expansion of federal oversight was not intended to supplant States' authority to regulate the sale and marketing of tobacco and tobacco-related products. It expressly preserved that authority in the TCA's detailed preemption scheme:

> nothing in this subchapter . . . shall be construed to limit the authority of . . . a State . . . to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this subchapter, including a law, rule, regulation, or other measure relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age . . . .

21 U.S.C. § 387p(a)(1) (the "Preservation Clause"). The TCA then provides a limited express preemption clause preventing States from imposing

> any requirement which is different from, or in addition to, any requirement under the provisions of this subchapter relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products.

*Id.* § 387p(2)(A) (the "Preemption Clause"). Finally, the TCA provides a savings clause to make clear what is *not* preempted, establishing that States remain authorized to impose requirements

> relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age . . . .

*Id.* § 387p(2)(B) (the "Savings Clause").

These provisions broadly preserve state and local authority to regulate tobacco product sales. Unsurprisingly, four Circuits have held that States or local governments are not preempted from implementing broad bans on tobacco product sales, including the flavored products Appellants want to sell. TCA. *City of Edina*, 60 F.4th at 1178; *R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542, 555 (9th Cir. 2022); *U.S. Smokeless Tobacco Manu. Co. v. City of New York*, 708 F.3d 428, 434 (2d Cir. 2013); *Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence*, 731 F.3d 71, 82 (1st Cir. 2013).

Appellants argue that, while Wisconsin could ban vape products altogether, it cannot use a product's receipt of an FDA premarket authorization order as one way to qualify for the directory. But both the court below and the district court in *Wooten*, 2025 WL 1787420, at *5, recognized that that theory directly conflicts with the congressional command in the TCA's Preservation and Savings Clauses. As the district court here concluded, "[t]o find a sales requirement preempted because it acknowledged a floor set by the federal government would appear to ignore Congress's intent that each state have final authority on what tobacco products may be sold in its marketplace." J.A.1105.[13]

---

[13] Only *Iowans for Alternatives*, 781 F. Supp. 3d at 739, has found a sales statute preempted under § 337(a). *Grand River Enterprises Six Nations v. Knudsen*, 2024 WL 2992503, at *1 (9th Cir. 2024), which Appellants have cited elsewhere, was not about state sales regulations: it was about whether the terms of an attorney general's settlement agreement with a tobacco manufacturer, which required it to comply with all federal laws, was preempted.

Appellants newly argue that the Preservation and Savings Clauses do not preserve a State's ability to have the same standard as under federal law. (7th Dkt. 18:29–30.) The statutes need not say that States and local governments may enact identical regulations because the basic concept of preemption seeks only to prevent *conflicting* standards, not identical ones. Here, the Preservation and Savings Clauses permit not only identical regulations, but also additional and more stringent ones.

Treating § 337(a) as preempting state and local regulation of tobacco sales would ignore Congress's decision not to preempt such regulation in the TCA's Preservation and Savings Clauses. That is not a reasonable reading of the statutes.

### b. Appellants' reading of 21 U.S.C. § 337(a) conflicts with the statute's language and *Buckman.*

Appellants' claim also fails because they misunderstand the reach of 21 U.S.C. § 337(a) itself. That provision, located in subchapter III of the FDCA, "Prohibited Acts and Penalties," provides: "all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States." The statute's plain language prohibits only lawsuits that would adjudicate whether someone is violating specific provisions of the FDCA.

Conflict preemption, which Appellants invoke here, occurs "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The "[i]mplied preemption analysis does not justify 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'" *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (citation omitted). On the contrary, "evidence of pre-emptive purpose" must "be sought in the text and structure of the statute at issue." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (citation omitted).

Here, the preemptive purpose in § 337(a) is only to limit lawsuits that would adjudicate whether provisions of the FDCA have been violated—not where a statute merely cross-references an FDA approval. In *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 343, 353 (2001), the Supreme Court applied § 337(a) in a case where there was no presumption against preemption because it involved allegations of fraud on the FDA, not a field that the States have traditionally occupied. 531 U.S. at 347. And even then, the Court held only that the private plaintiffs' suit was preempted because it would have required the trial court to adjudicate whether the FDA had been defrauded. *Id.*

The Court did not hold, as Appellants assert, that the claim was preempted "because the existence of the FDCA was a critical element" of the plaintiffs'

claims there. (7th Dkt. 18:24 (citing *Buckman,* 531 U.S. at 353).) At the passage Appellants cite, the Court was not enunciating its interpretation of § 337(a); it was distinguishing the facts of the case from the precedent those plaintiffs relied on. The Court's holding was that § 337(a) impliedly preempts state causes of action that could result in conflicting obligations between FDA determinations and state court adjudications: "fraud-on-the-FDA claims would also cause applicants to fear that their disclosures to the FDA, although deemed appropriate by the Administration, will later be judged insufficient in state court." *Buckman*, 531 U.S. at 351.

Appellants' string cited cases, mostly listed in a footnote (7th Dkt. 18:22 n.7), are consistent. They all involved state law claims that were preempted because they would have required a trial court to adjudicate whether the defendant was violating a provision of the FDCA. *See Nexus Pharms., Inc. v. Cent. Admixture Pharm.*, 48 F.4th 1040, 1046–47 (9th Cir. 2022) (claim required determining whether a drug was subject to FDA approval); *Novo Nordisk Inc. v. Live Well Drugstore, LLC,* 2025 U.S. Dist. LEXIS 17792, *7–9 (M.D. Fla. 2025) (same); *Loreto v. Procter & Gamble Co.*, 515 Fed. Appx. 576, 579 (6th Cir. 2013) (claim required determination of whether defendant violated FDCA requirements for drugs); *Hyde v. C.R. Bard, Inc.*, 2018 U.S. Dist. LEXIS 155206 *256-57 (D. Ariz. 2018) (claim required determining whether defendants had violated FDCA's medical device provisions); *Vanzant*

*v. Hill's Pet Nutrition Inc.*, 2025 U.S. Dist. LEXIS 12854, \*17 (N.D. Ill. 2025) (claim based on marketing and sale of pet food required court to determine whether pet food was a drug subject to FDA approval); *Anthony v. Country Life Mfg., LLC*, 2002 U.S. Dist. LEXIS 19445, \*8–9 (N.D. Ill. 2002) (claim based on marketing and sale of nutrition bars would require a determination whether ingredients required approval by FDA); *Scanlon v. Medtronic Sofamore Danek USA, Inc.*, 61 F. Supp. 3d 403 412 (D. Del. 2014) (fraud-on-the-FDA claim preempted). A final cited case turned on express preemption, based on a statute not at issue here. *Regan v. Sioux Honey Ass'n Coop.,* 921 F. Supp. 2d 938, 944–45 (E.D. Wis. 2013) (preemption of a state's honey labeling regulation by a federal statute expressly preempting food labeling).

Under § 337(a), where state law requires no determination of whether a regulated party has violated the FDCA, there is no implied preemption. Simply cross-referencing an FDA approval order requires no such adjudication: the party either has FDA approval or it doesn't.

The Sixth Circuit explained that distinction in *Garcia v. Wyeth-August Laboratories*, 385 F.3d 961, 965–66 (6th Cir. 2004), which considered the effect of a Michigan immunity statute on a plaintiff's claim against a medical device manufacturer. The court rejected the district court's general invalidation of Michigan's law, holding that it presented an implied preemption problem only

in cases where the defense would require the court to independently determine

whether the FDA had been defrauded:

> Doubtless, *Buckman* prohibits a plaintiff from invoking the exceptions on the basis of *state court* findings of fraud on the FDA. Such a state court proceeding would raise the same inter-branch-meddling concerns that animated *Buckman.* But the same concerns do not arise when the *FDA itself* determines that a fraud has been committed on the agency during the regulatory-approval process. *Cf. Buckman,* 531 U.S. at 351, 121 S. Ct. 1012. . . .

*Garcia,* 385 F.3d at 966. The court went on to endorse state laws that

incorporate federal determinations:

> Thus, in this setting, it makes abundant sense to allow a State that chooses to incorporate a federal standard into its law of torts to allow that standard to apply when the federal agency itself determines that fraud marred the regulatory-approval process.

*Id.*[14]

In *Wooten,* 2025 WL 1787420, at *5, the court made the same observation.

Like Wisconsin's statute, one way North Carolina allows a vape product to

appear on its state directory is if it has an FDA approval order. *Id.* at *2. The

court held that whether a party is complying with the TCA or not is "not a basis

for the North Carolina Department of Revenue Secretary to initiate

proceedings." *Id.* at *5.

---

[14] There is a Circuit split about whether such immunity provisions ever are preempted in a case where they would provide a defense. *See Lofton v. McNeil Consumer & Specialty Pharm.*, 682 F.Supp. 2d 662, 674–75 (N.D. Tex. 2010) (discussing disagreement). That debate is not relevant here.

The district court made the same point here: "this court disagrees with the conclusion [by the Iowa district court] that merely relying on the FDCA in part in regulating tobacco products means that it is enforcing it. Regardless, a violation of the FDCA is not itself actionable basis for the DOR to initiate proceedings." J.A. 1104.

Those courts were correct. Here, unlike in *Buckman*, the presumption against preemption does apply. And Wis. Stat. § 995.15 requires no judicial determination of whether a tobacco product complies with provisions of the FDCA. A manufacturer certifies either that the FDA has issued a premarketing authorization order for that product; it applied for FDA marketing authorization on or before September 9, 2020; or the product is hemp. Wis. Stat. § 995.15(2). Wisconsin's law requires (and permits) no adjudication of whether someone has violated a provision of the FDCA.

Appellants construe § 337(a) as implicitly preempting any state law that cross-references or mentions FDA approval. (7th Dkt. 18:19, 26.) Only one court has reached that conclusion: the Iowa district court decision in *Iowans for Alternatives to Smoking & Tobacco, Inc.* But that court simply concluded without explanation that Iowa's directory is "contingent on manufacturers' compliance with federal premarket authorization processes." 2025 WL 1276006, at 11. That conclusion is belied by the plain language of the statutory provision referencing the FDA's premarket approval—it simply asks whether

the manufacturer has a premarket approval order, not whether such an application was required, correctly granted, or fraudulently obtained.

Nothing in § 337(a) even hints at the reading Appellants seek. As the great weight of authority makes clear, the preempted court actions are those where courts must adjudicate a potential violation of the FDCA. A cross-reference to an FDA approval requires no such determination.

### 3. Appellants' "enforcement discretion" preemption theory is legally and factually unsupported.

Appellants also assert that Wisconsin's law conflicts with the choices FDA might make about which products to pursue. (7th Dkt. 18:16, 32–33.) Courts have long rejected the argument that if a State enacts a law that relies on a federal permission, it is preempted as interfering with federal enforcement choices. *See California v. Zook*, 336 U.S. 725, 735 (1949); *Zyla Life Sciences, LLC v. Wells Pharma of Houston, LLC*, 134 F. 4th 326, 330–31 (5th Cir. 2025) (rejecting preemption challenge to statutes making it illegal to sell new drugs without approval from the FDA based on theory that they "upset the discretion given to federal officials in enforcing the FDCA."); *see also Kansas v. Garcia*, 589 U.S. 191, 212 (2020) (the "possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption.").

That reasoning is even more compelling in the tobacco sales arena, where Congress went to great pains to preserve the States' ability to regulate the sale

of tobacco products. 21 U.S.C. §§ 387p(a)(1), 387p(a)(2)(B). The cases Appellants rely on, (7th Dkt. 18:33), *United States v. Iowa*, 126 F.4th 1334, 1337 (8th Cir. 2025), *vacated by* 2025 WL 1140834 (8th Cir. 2025), and *Geo Group Inc. v. Newsom*, 50 F.4th 645, 762 (9th Cir. 2022), involved immigration, an enforcement arena uniquely dedicated to the federal government. As the *Iowa* court recognized, that area is an outlier: in the "vast majority of cases where federal and state laws overlap," a finding of preemption would "turn [our federal system] upside down." 126 F.4th at 1348.

### 4. Appellants' claims that § 387p expressly preempts Wisconsin's law—not pled in the Complaint—are unpersuasive.

In their response to Appellee's motion to dismiss, and now here, Appellants also argue that Wisconsin's statute runs afoul of 21 U.S.C. § 387p(a)(2)(A). (7th Dkt. 18:19, 39, 40–41; Dkt. 75:36–38; 42–44.) Their Complaint does not plead such a claim,[15] but even if it had, it would still have poor prospects of success.

Appellants rely on the TCA's Preemption Clause, which provides that States may not impose "any requirement which is different from, or in addition to, any requirement under the provisions of this chapter relating to tobacco product standards, premarket review, adulteration, misbranding, labeling,

---

[15] Appellants recognized this problem in the district court, saying they will seek leave to file an amended complaint if their Complaint is dismissed. (Dkt. 75:43 n.14.)

44

registration, good manufacturing standards, or modified risk tobacco products." 21 U.S.C. § 387p(a)(2)(A). That clause is sandwiched between the Preservation and Savings Clauses in the TCA, which expressly preserve the State's ability to regulate the sales of tobacco products, including more expansively than under federal law. 21 U.S.C. §§ 387p(a)(1), 387p(a)(2)(B).

Appellants assert that Wisconsin's law runs afoul of the TCA's preemption provision on the theory that it compels compliance with "premarket review requirements." (7th Dkt. 18:40–41.) But all that § 387p(a)(2)(A) preempts are premarket review requirements "under the provisions of this chapter" that are "different from, or in addition to," federal law. Appellants don't explain what premarket review means in the federal law or explain how Wisconsin's law is "different from, or in addition to," those requirements. In reality, there is no conflict.

"Premarket review" under the TCA is an extensive statutory procedure undertaken by the FDA to determine whether a tobacco product should be approved for sale in the United States. It involves the manufacturer's submission of an application containing information about investigations that have been made to show the health risks of the tobacco product; a full statement of the product's components, ingredients, additives, and properties; a full description of the methods used in, and the facilities and controls used for, the manufacture and processing of the product; samples of the product and

its components; samples of proposed labeling; and other information the FDA

Secretary requires. 21 U.S.C. § 387j(b)(1). The FDA takes this information and

makes its determination based on specific criteria:

> For purposes of this section, the finding as to whether the marketing of a tobacco product for which an application has been submitted is appropriate for the protection of the public health shall be determined with respect to the risks and benefits to the population as a whole, including users and nonusers of the tobacco product, and taking into account—
>
> **(A)** the increased or decreased likelihood that existing users of tobacco products will stop using such products; and
>
> **(B)** the increased or decreased likelihood that those who do not use tobacco products will start using such products.

21 U.S.C. § 387j(d)(4).

Wisconsin's law includes nothing like this. It does not review products at

all, much less evaluate their chemical composition, packaging, and

manufacturing methods. It does not make a product-specific public health

determination that takes into account whether the product will lure new users.

And beyond the fact that Wisconsin has no premarket review process, it also

can reach no conflicting view about which products the FDA has approved. As

the court observed in *County of Los Angeles*, "[a] state cannot *require* tobacco

companies to make their products according to any particular standard—only

the federal government can do that. But a state can place restrictions on the

retail sale of a tobacco product, including banning its sale altogether."

29 F.4th at 560. That is the case here. Wisconsin is not requiring vape products

to be manufactured in a particular way; it is just restricting the sale of a product.

Quoting *Farina v. Nokia Inc.*, 625 F.3d 97, 131 (3d Cir. 2010), Appellants say that § 387p does not preserve state regulations that "conflict with federal policy." (7th Dkt. 18:40.) But *Farina* was not about federal policy preferences; it was talking about potential conflicts between state and federal *regulations. Id.* at 131.

The notion that Wis. Stat. § 995.15 is a stealth, and conflicting, premarket review to the FDA's statutory process is not a credible argument.[16]

Appellants' preemption claim has no reasonable likelihood of success. It ignores the presumption against preemption, casts aside Congress's decision to preserve the regulation of tobacco product sales by the States, and misunderstands what 21 U.S.C. § 337(a) does.

## II. The balance of equities and the public interest weigh against a preliminary injunction.

Because Appellants have no strong likelihood of success on the merits, this Court need not proceed to the "balancing phase" of the preliminary injunction analysis, where the court weighs the harms and equities and considers the

---

[16] Appellants assert that this "premarket review" argument has come up only in the recent federal cases challenging state vape sales regulations. (7th Dkt. 18:39.) The fact that lawyers have only recently imagined this argument does not suggest there is a problem with the state laws.

public interest. *Cassell*, 990 F.3d at 545. But if this Court reached these factors, the district court did not abuse its discretion by concluding that the balance of equities and public interest weigh against an injunction.[17]

Appellants suggest that if they make a strong showing on the merits, the equities are in their favor. (7th Dkt. 18:60.) The cases they cite don't support that proposition. *ACLU v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2010), involved a First Amendment challenge, and the court there concluded that enjoining it was in the public interest because the public's First Amendment's rights were furthered by the injunction. *Id.* at 590. *Bank One, N.A. v. Gattau*, 190 F.3d 844, 848 (8th Cir. 1999), was about the standards for a *permanent* injunction.

> **A.** **Appellants are not entitled to an equitable remedy when their lost income is from illegal sales and they made no effort to pivot to legal products in the lead-up period before the directory law went into effect.**

When Appellants complain that they are losing revenue because of Wisconsin's directory law, it is primarily because their illegal, flavored nicotine vapor products are not eligible for the directory. But Appellants have no valid reliance interest in revenue from sales of illegal products. The FDA has not

---

[17] The district court found that Appellants established a reasonable likelihood that they will suffer economic harm in the form of lost sales revenue because of Wisconsin's directory law. J.A. 1108–09. Appellee disagrees, but recognizing the deferential standard of review, does not challenge it.

approved any flavored nicotine vape products for marketing, and as the *Wages & White Lion* case illustrates, such products are unlikely to ever be approved due to their risks to youth. Appellants' alleged harms are even less compelling considering they failed to take steps to avoid those harms and instead increased their risk by continuing to stock unauthorized products up until the eleventh hour.

### 1. Appellants have no valid reliance interest in revenue from illegal sales.

Contrary to Appellants' claims, the FDA has no policy of nonenforcement against their products, and the FDA has warned retailers that the pendency of marketing application does not create a safe harbor:

> Enforcing against unauthorized ENDS products, including unauthorized products popular with youth, are among our highest enforcement priorities.
>
> A new tobacco product must have FDA authorization before it can be legally marketed, and generally, products without authorization are at risk of enforcement action.
>
> FDA *has not adopted a broad policy of enforcement discretion* regarding tobacco products without marketing authorization. For the vast majority of unauthorized e-cigarettes on the market today*, the pendency of an application does not create a legal safe harbor to sell that product.*

J.A. 0977 (emphasis added).

Appellants have relied on the FDA's 2020 guidance in support of their nonenforcement theory. But as acknowledged by the Supreme Court this year, even that earlier guidance conferred no permission to sell unauthorized

products. *See Wages & White Lion*, 604 U.S. at 583. Further, to the extent the FDA exercises necessary discretion to make the best use of its limited enforcement resources, "a belief about how an agency is likely to exercise its enforcement discretion is not a 'serious reliance interes[t].'" *Id.* at 585 (quoting *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Appellants are not entitled to equitable relief to resume selling products that are illegal for sale—sales in which they had no valid reliance interest to begin with.

### 2. Appellants did not try to avoid the economic harms they allege, instead continuing to sell and restock unauthorized products.

Despite being aware of Wisconsin's law for months, Appellants did virtually nothing to avoid economic harm. Rather than preparing their businesses by pivoting to legal products, they continued to restock unauthorized products, thereby increasing their risk.

To illustrate, Beaupre was aware of the directory law beginning in January 2025 but generally made no effort to bring his business into compliance before September 1. J.A. 1025–26 (Tr. 9:3–7, 10:9–11:22).) As of his August 12, 2025, deposition, he was still purchasing and restocking unauthorized flavored e-cigarette products, which he intended to continue selling so long as he could access them. J.A. 1026 (Tr. 10:9–11:22). Other affiants testified similarly. *See, e.g.*, J.A. 0821 (Hr'g Tr. 67:4–11 (Abujad had "done nothing really" to

prepare his business and inventory)); J.A. 1044 (Tr. 6:6–9 (Patel had not taken "any" steps to prepare)); J.A. 0840 (Hr'g Tr. 86:10–87:1 (Hall testifying that, other than bringing this lawsuit, things are "for the most part, business as usual")).

Appellants have also not made genuine efforts to increase their inventory of vape products that are on the directory, even though Hall admits that it is possible that once customers are limited to those products and their preferred products are unavailable, they will start buying more of them. J.A. 0838 (Hr'g Tr. 84:10–17).

Below, the district court stated that Appellants "presented evidence that switching to carrying the few industry products that *are* currently compliant with Wis. Stat. § 995.15 is not feasible because other competitors in the industry -- such as gas stations and convenient stores -- already sell those same products at discounts under arrangements with manufacturers reserving shelf space for traditional combustible cigarettes." J.A. 1109. Appellants provided

no non-hearsay evidence to support these claims.[18] As a matter of common sense, distributors may offer better rates to retailers like gas stations and convenience stores that order larger quantities. But Appellants made no effort to prove that they attempted to negotiate favorable terms based on purchasing increased amounts of legal products.

## B. The State and the public would be irreparably harmed by a preliminary injunction.

On the other side of the scale, the State and the public would be irreparably harmed if the Court issued a preliminary injunction, for three reasons.

*First*, a state suffers irreparable injury whenever its validly enacted laws are enjoined. *Maryland v. King*, 567 U.S. 1301, 1303 (Roberts, C.J., in

---

[18] At deposition, Beaupre and Patel admitted that they had no conversations with any distributor or manufacturer that told them they could obtain better pricing for FDA-authorized vape products if they also purchased cigarettes. Asked to provide his basis for the pricing allegation, Beaupre responded vaguely: "History in the industry, things said to me, conversations I've had. That's just like the general understanding." J.A. 1027 (Tr. 15:14–17). He denied having "exact evidence or proof or, you know, anything that was in writing." *Id*. at Tr. 16:6–8. A distributer has never personally told Beaupre that he would need to carry traditional cigarettes to obtain a better rate for vape products. *Id*. at Tr. 17:13–16. Similarly, Patel testified that this was just "general industry knowledge" and that he had no direct conversations. J.A. 1045 (Tr. 11:5–12:1).

Arnold said that she received this information from an R.J. Reynolds distributor salesperson in 2022 and from an unidentified source at Merrill Distribution. J.A. 1056 (Tr. 12:9–20). But the R.J. Reynolds evidence was an oblique comment from a 2022 email exchange that did not demonstrate that assertion. *Id*. at 12:21–13:2. Arnold described the unnamed Merrill salesperson as having said that companies offered better rates for "volume" purchases, *id*. at 13:13–14:7, not purchases bundled with cigarettes.

chambers). The public is also irreparably harmed, as the public always has an interest in the enforcement of duly enacted laws. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). This is especially true in the realm of public health and safety.

*Second*, an injunction would harm public health because it would stymie a regulatory process designed to prevent the sale of unauthorized, harmful vape products in Wisconsin. A sizeable majority of the products offered for sale by Appellants are flavored nicotine vape products, and it is undisputed that these products pose health risks and are particularly appealing to youth. *See generally Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 271 (D.C. Cir. 2019) ("E-cigarettes are indisputably highly addictive and pose health risks, especially to youth."); *see also* J.A. 0100–06 (flavored e-cigarettes are "extraordinar[ily] popular" with youth and raise heightened addiction concerns). If the injunction is granted, such products will continue to flow into the State unabated.

Appellants say their flavored nicotine vape products are beneficial to existing smokers who are transitioning off traditional cigarettes. (7th Dkt. 18:1, 7.) But the FDA has so far concluded that the public health harms of flavored nicotine products outweigh any benefits to transitioning cigarette smokers, given their strong appeal to young users. *See Wages & White Lion*, 604 U.S. at 548, 562–63.

*Third*, an injunction would punish the Wisconsin businesses—Appellants' competitors—which, unlike Appellants, prepared for the directory law by adjusting their inventories and stocking legal product. Appellants enjoyed a competitive advantage over those retailers over the past several months by continuing to restock illegal products while others scaled back, and it would be unfair to revive this advantage and upend the business actions taken in reliance on the law's September 1 enforcement date. *Compare* J.A. 1026 (Tr. 10:9–11:22) and 0840 (Hr'g Tr. 86:10–87:1), *with* 0453 ¶ 5, 0951 ¶ 8, 0962 ¶ 10.

Altogether, Appellants' desire to profit from the illegal sale of unauthorized vape products is far outweighed by the State and the public's interest in the continued enforcement of this public health law.

**C. The district court properly considered Appellants' unreasonable delay in seeking relief in weighing the preliminary injunction factors.**

The district court also properly exercised its discretion in considering Appellants' "delay in bringing suit," which further tips the balance of equities against them. J.A. 1095, 1110 (citing *Benisek v. Lamone*, 585 U.S. 155, 159–60 (2018)). The statute was enacted on December 3, 2023, and called for the directory to go into effect on September 1, 2025. Appellants filed 19 months later. They offered no justification for that delay.

Appellants have argued that Appellee had to demonstrate prejudice flowing from their delay, as with a laches defense, but prejudice has no role here. For

the preliminary injunction analysis, delay is relevant to the balance of equities because "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek*, 585 U.S. at 160. And even if prejudice mattered, Wisconsin *was* prejudiced as a factual matter: Appellants' eleventh-hour lawsuit complicated the Department's rollout of the directory, created confusion among the public, and interfered with preparations over a year in the making.

### D.  A preliminary injunction is also unwarranted under the unclean hands doctrine.

Under the unclean hands doctrine, courts should withhold an equitable remedy like a preliminary injunction "that would encourage, or reward (and thereby encourage), illegal activity." *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985). The question is whether the injunction would facilitate the activity: if a plaintiff had "acquired a patent in violate of antitrust limitations on patent pooling brought a suit to enjoin another from using the patent, the injunction would be refused on the ground that awarding it would assist in a violation of the antitrust laws." *Id.* (discussing *Frank Adam Elec. Co. v. Westinghouse Elec. & Mfg. Co.*, 146 F.3d 165 (8th Cir. 1945)).

That doctrine applies here. Sale of the unauthorized vape products violates federal law, and an injunction would facilitate Appellants' resumption of those sales.

**CONCLUSION**

The district court's decision, denying Appellants' motion for a preliminary injunction, should be affirmed.

Dated this 3rd day of September 2025.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

LYNN K. LODAHL
Assistant Attorney General
State Bar #1087992

Attorneys for Defendant-Appellee

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 Gibson
(608) 264-6219 Lodahl
(608) 294-2907 (Fax)
charlie.gibson@wisdoj.gov
lynn.lodahl@wisdoj.gov

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), typeface requirements of Fed. R. App. P. 32(a)(5), and type style requirements of Fed. R. App. P. 32(a)(6).

This brief contains 12,953 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 13 point Century Schoolbook.

# CERTIFICATE OF SERVICE

I certify that on September 3, 2025, I electronically filed the foregoing Brief of Appellee with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 3rd day of September 2025.

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845